Filed 12/29/22  In re I.R. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re I.R., a Person Coming Under the Juvenile Court Law. | B317369 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.M., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18CCJP00937C) |

APPEAL from an order of the Superior Court of Los Angeles County, Steff Padilla, Judge Pro Tempore.  Affirmed.

Pamela Deavours, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Timothy M. O'Crowley, Deputy County Counsel, for Plaintiff and Respondent.

_____

In a dependency proceeding involving I.R. (minor), C.M. (father) appeals the juvenile court's order denying his petition to change court orders under Welfare and Institutions Code section 388.[1]  Finding no abuse of discretion, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Family background and history*

Mother met father when she was 14 years old, and he was in his 20's.[2]  Mother has been addicted to drugs since the age of 16.  Mother and father had a lengthy history of domestic violence.  Both parents have multiple other children, but we only review the child welfare history of three children relevant to the current case:  minor (born March 2019); brother (born July 2005); sister (born September 2009); and half-brother on father's side.  In 2008, half-brother was declared a dependent based on his mother's drug use.  The juvenile court granted father sole custody

_____

[1] Statutory references are to the Welfare and Institutions Code.  Section 388 permits parents and other individuals with an interest in a dependent child to petition the juvenile court to modify or set aside prior court orders.  (§ 388, subd. (a).)

[2] Mother is not a party to this appeal.  Her involvement in the dependency case was minimal, and we discuss her role only as relevant to father's appeal.

of half-brother and terminated jurisdiction in October 2008. A separate case involving brother and sister began in 2010, based on sustained allegations of domestic violence and physical abuse of brother. The case ultimately ended in 2015, with the court granting maternal grandparents legal guardianship of the two children.

During most of her pregnancy with minor, mother was living in motels to avoid coming into contact with father, who had constantly threatened to kill her family in the past. Mother believed that father had vandalized maternal grandparents' property, including slashing the tires of maternal grandfather's truck and throwing paint on it. Mother tested positive for methamphetamine after giving birth to minor at a gestational age of 32 weeks in March 2019. At the hospital, mother acknowledged her drug use and understood why the Los Angeles County Department of Children and Family Services (Department) was involved.

Father had been visiting minor at the hospital, but nevertheless wanted to confirm paternity. He acknowledged using methamphetamine in the past, but claimed he stopped using drugs in early 2000. Father's lengthy criminal history included a 2007 conviction for threatening a crime with intent to terrorize and a 2010 conviction for child cruelty with a two-year prison sentence. More recently, father entered a guilty plea for possession of brass knuckles and was anticipating turning himself in to serve an eight-month jail sentence on April 12, 2019. Minor's maternal aunt and uncle (caregivers) reported that mother wanted them to care for minor.

*Father's mixed participation in reunification services in current case*

Once minor was discharged from the hospital in April 2019, she was detained from parental custody and placed with caregivers. In June 2019, the court sustained jurisdictional allegations under section 300, subdivisions (b) and (j), based on the parents' history of domestic violence and the prior dependency case involving sister and brother. Father was permitted monitored visits three times per week, and the court ordered him to complete a 52-week domestic violence program and parenting education program, and to participate in individual counseling. Minor remained placed with caregivers.

The Department's six-month review report noted several concerning details about father's visits with minor. The caregivers were initially monitoring father's visits with minor, but they reported that very little engagement and bonding took place, and father would curse and say bad things about mother and maternal family members while holding minor. The caregivers stopped monitoring father's visits in May 2019, because they no longer felt comfortable or safe doing so. Paternal grandmother monitored father's visits starting in late May 2019, and she reported no concerns.

In July 2019, father enrolled in a domestic violence program with Acacia Counseling, but his participation was terminated in October 2019 due to poor attendance (father had missed five of 13 sessions). He enrolled in a parenting program on August 23, 2019, and had attended five weekly sessions as of October 24, 2019. He was participating in weekly individual counseling sessions, making progress on his therapy goals,

4

focused on addressing domestic violence, anger management, and coping skills.

In September 2019, the Department substantiated a report that father had physically abused half-brother.  Father, who was previously living with paternal grandmother and half-brother, moved out of paternal grandmother's home and was living with an acquaintance.  Because paternal grandmother had been present when father abused half-brother, she was no longer an appropriate monitor for father's visits with minor.  By late November 2019, the social worker and father identified a new monitor and a location for future visits.

At the December 2019 six-month review hearing, the court ordered the Department to continue providing reunification services and to set up a visitation schedule for father.  The 12-month review hearing, originally scheduled for June 2020, was continued to September 18, 2020 due to the COVID-19 pandemic.

*Twelve-month review report and hearing—court grants father an additional six months of reunification services*

The Department's 12-month review report described minor as a joyful child who was well bonded to the caregivers.  Due to COVID-19, father's monitored visits switched over to remote visits using a phone application.  The monitor reported there was tension between the caregivers and father, but the monitor reported no concerns about the visits.  While it is not clear from the record when father resumed in-person visits, the Department liberalized his visits to permit unmonitored visits in person beginning July 21, 2020, three times a week for three hours per visit, with the exchange taking place at a police station.  No

5

issues were reported regarding the exchanges, and father reported he and minor were bonding more and minor was comfortable with him. Caregivers reported minor often returned fussy and in a bad mood.

Father had strong participation in his domestic violence and parenting classes in the first half of 2020, but began to falter in July and August of the same year. Acacia Counseling, the same domestic violence program that had previously terminated father's participation in October 2019, permitted father to return and reported he was doing well as of June 2020. However, even after the program director spoke to father about the importance of consistent attendance, and changed class dates to accommodate father's work schedule, father had five absences, resulting in another termination from the program in August 2020. According to the program director, father verbally abused female staff members when the female facilitator brought father's lack of attendance to his attention. Father accused the program director of making false claims about his behavior; father also claimed that the program director refused to give father his transcripts so he could enroll at another program. The program director responded that father's termination letter had the necessary transcript information. Father was able to enroll in a different domestic violence program through Baldwin Park Counseling on August 27, 2020.

Father had attended 15 sessions of parenting classes through Spiritt Family Centers before the program stopped in-person sessions in March 2020 due to COVID-19. Thereafter, father's participation in video sessions was consistent and he was an active participant. However, on July 17, 2020, father was reportedly "concerned about going back to jail for something that

6

took place in the past and had a nervous breakdown," becoming very angry, yelling and swearing. By August 25, 2020, father had missed approximately four to five weeks of sessions, although he attended a session on August 21, 2020. The program facilitator felt that father needed to attend an anger management program, and did not believe father was ready to have children returned to his care.

By August 19, 2020, father had completed 56 individual counseling sessions. A letter describing father's progress stated that the therapist was "addressing case-related issues surrounding anxiety, emotional regulation[,] and anger management." Father's treatment included "identification of triggers related to anger, best practices for emotional regulation, understanding parental responsibilities related to child safety, fostering personal insight, developing and maintaining healthy coping skills, and challenging historic narratives that are incompatible with [father's] treatment goals." The therapist noted that while father had "demonstrated growth," his treatment was "not yet in the end-phase." Father maintained his participation in individual counseling, and continued to make progress in dealing with anxiety, emotional regulation, anger management, and identifying triggers related to his anger.

The Department's review report made no mention of a pending criminal case against father. The Department recommended continuing reunification services for father, and setting a date for an 18-month review hearing.

At the 12-month review hearing on September 18, 2020, the court considered the Department's reports and arguments from counsel. After father acknowledged to the court that he understood he needed to secure housing, and stated he had been

reinstated and had completed 30 weeks of a 52-week domestic violence program, the court found that father was likely to reunify within the next six months, and ordered the Department to continue providing reunification services.

*Eighteen-month review report and hearing—reunification services are terminated after father is incarcerated*

The Department's 18-month review report included information that was known, at least to father, at the time of the 12-month review hearing, but that was not included in the Department's 12-month review report. Neither father nor the Department communicated the following information to the court at the 12-month review hearing, which took place on September 18, 2020. On September 17, 2020, father informed the social worker he would be turning himself in on September 21, 2020, to serve 220 days in county jail, with a hope that he would be released early. The jail term stemmed from father violating a restraining order restricting father from having physical contact with half-brother. Father had received notice in April 2020 of the criminal hearing scheduled for July 13, 2020. Father reportedly went to court with an intent to "fight the case," but after consulting with his public defender, he decided to turn himself in for jail time. Father also reported he had informed the caregivers that he would not be able to have visits with minor. The social worker confirmed with the jail that father's projected release date was in February 2021. It is unclear whether the Department was aware of pending criminal charges against father or the details of an open dependency case involving half-brother at the time the 12-month review report was prepared in September 2020.

8

Most of the remaining information in the Department's 18-month status review report simply repeated the information given in the Department's 12-month status review report. The caregivers expressed interest in providing permanency. Considering father's prior problems completing reunification services, as well as the fact that "he was incarcerated as a result of violating a restraining order protecting [half-brother], who has a Dependency case open in part due to father's physical abuse," and father's anticipated release date of February 2021, the Department recommended terminating reunification services for father and setting a hearing under section 366.26.

The court terminated father's reunification services on December 15, 2020. There is no indication in the record that father requested or had any visits with minor while he was incarcerated from September 2020 through February 2021. After he was released from jail in late February 2021, father had monitored visits with minor three times per week for three hours per visit. Although the Department had previously determined paternal grandmother was no longer an appropriate monitor in 2019, the record does not explain why she resumed monitoring father's visits after his release from incarceration.

*Father's section 388 petition*

On June 16, 2021, father filed a petition under section 388, asking the court to vacate its December 2020 order, reinstate reunification services, and order unmonitored and weekend overnight visits with minor, along with services such as conjoint counseling to address any barriers to reunification. Attached to father's section 388 petition were letters demonstrating that

9

father had completed 52 sessions of a domestic violence program (including 28 sessions credited from his sessions with Acacia Counseling), 27 sessions of parenting classes, including 19 sessions since January 2021, and 73 sessions of individual counseling since March 2019. The court scheduled an evidentiary hearing, and directed the Department to file a response to the petition.

*Subsequent reports and evidentiary hearing*

In July 2021, father requested a nine-hour monitored visit to take place on July 31, 2021, so he could take minor to Knott's Berry Farm to celebrate brother's birthday, together with sister and half-brother. The caregivers agreed to a six-hour visit, but during the visit, father had difficulty managing his time with minor and the siblings simultaneously. He called the caregivers and asked them to pick minor up from Knott's Berry Farm, and they did so at 2:15 p.m. On August 6, 2021, the caregivers reported they had received a phone call from sister, who was present during the Knott's Berry Farm trip. Sister informed the caregivers that after the caregivers had picked minor up at Knott's Berry Farm, father started making claims that he was going to kill the caregivers, and that while father was making the threats, paternal grandmother was telling him to "be quiet."

Father had monitored visits with minor three times a week, monitored by paternal grandmother. Father's communications with the social worker in August 2021 evidenced continuing tensions and distrust between father and maternal family members. The caregivers reported minor would return after visits in a fussy or agitated mood, often hitting herself on the

10

head in anger.  Father reported that during visits, he would feed minor and take her to the park to play.  He felt well-bonded to minor.  Paternal grandmother expressed to the social worker that she had no concerns regarding father's behavior, and that father deserved unmonitored visits.

At the evidentiary hearing on father's section 388 petition, the court heard testimony from father's therapist.  The therapist described the work father had done to identify his triggers and learn coping mechanisms.  The therapist acknowledged father continued to struggle with triggers and anger issues, and described father's feelings relating to the caregivers as "frustration, not being properly understood, being misrepresented."  Paternal grandmother testified about father's visits with minor, and about the family visit to Knott's Berry Farm, denying that father threatened to kill the caregivers.  She never had any concerns about father's behavior towards any of his children, had never seen him get angry and never heard other family members describe him as getting angry.  She was aware that a restraining order protected half-brother from father, but was not sure if father had violated the restraining order.  She believed father had a positive relationship with minor, and he should have unmonitored visits.  Father testified about his relationship with mother and her family, describing both relationships as "toxic."  He described his request for a nine-hour visit with minor, stating the caregivers would only agree to three or four hours.  He denied being upset, saying instead he was "disappointed."  Responding to the court's questions, father described his relationship with caregivers starting out okay, but deteriorating over time, and that it was currently "real shaky."  Father did not know why the relationship had deteriorated.

11

After hearing oral argument from all parties, the court denied father's section 388 petition. The court explained that while father's testimony was compelling, the court credited the report that father had threatened the caregivers and found paternal grandmother was not credible. Father had not shown a sufficient change in circumstances, based on his lengthy history of domestic violence, having recently harassed female staff, and having been arrested for abusing his son. Father filed the current appeal.

## DISCUSSION

*Relevant law and standard of review*

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) "'The burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue. Section 388 provides the "escape mechanism" that . . . must be built into the process to allow the court to consider new information.'" (*In re Zacharia D.* (1993) 6 Cal.4th 435, 447.) "Even after the focus has shifted from reunification, the scheme provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) However, "after reunification services have terminated, a parent's [section 388] petition for either an order returning

12

custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

A party seeking relief under section 388 "has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) In evaluating the petition, the juvenile court "may consider the entire factual procedural history of the case." (*Id.* at p. 616.) Factors to be considered in determining what is in the best interests of a child under section 388 include "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.)

We review an order denying a parent's section 388 petition for abuse of discretion. (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M., supra*, 7 Cal.4th at pp. 318–319.)

13

*Analysis*

Father contends the evidence did not support the court's stated reasons for denying his section 388 petition.  He further argues that having demonstrated changed circumstances, the court abused its discretion in concluding that the father had not shown the requested orders were in minor's best interests.

When the juvenile court terminated father's reunification services at the 18-month review hearing, father was serving a jail term for violating a restraining order protecting half-brother.  Father's section 388 petition sought unmonitored visits with minor, and his release from incarceration was likely adequate to show changed circumstances.

However, father has not met his burden to show that his requested relief was in minor's best interests.  Father argues that minor's bond with her caregivers should not preclude giving him the opportunity to continue to strengthen his bond with minor.  He emphasizes the positive nature of his visits with minor, and that there was evidence he was gaining more insight into how his words and actions could be perceived as aggressive and working on changing how he came across.  But father's argument does not account for his lengthy and serious criminal history, his prior threats and violence towards maternal family members, and the idea that additional reunification services would only delay permanency for minor, who had been living with caregivers for her entire life, since being discharged from the hospital at around three weeks old.  Father has not demonstrated how making his visits unmonitored would advance minor's physical or emotional well-being, and there was no evidence that father's efforts had moved him closer to reunifying with minor.  Instead, he had what

14

could accurately be described as a friendly relationship with the child, limited to visits at the park.  We therefore conclude that it was within the court's discretion to find that it was not in minor's best interests to reinstate reunification services for father, or to grant him unmonitored visits.

## DISPOSITION

The juvenile court's order denying father's section 388 petition is affirmed.

NOT TO BE PUBLISHED.



MOOR, J.


We concur:



RUBIN, P. J.



BAKER, J.